Brad H. Bearnson (#3633)
Wayne K. Caldwell (#9466)
Aaron K. Bergman (#13147)
BEARNSON & CALDWELL
399 North Main, Suite 270
Logan, Utah 84321
Telephone: (435)752-6300
Email: bbearnson@bearnsonlaw.com
Email: wcaldwell@bearnsonlaw.com
Email: abergman@bearnsonlaw.com
Please copy: bjensen@bearnsonlaw.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| JOSEPH W. ELLIOTT,<br><br>        Plaintiff<br>    v.<br><br>SYKES ENTRPRISES, INC., a Foreign Corporation; SITEL WORLDWIDE CORPORATION, a Foreign Corporation; FLORIDA MERGERSUB, INC., a Foreign Corporation; FOUNDEVER WORLDWIDE CORPORATION, a Foreign Corporation; and FOUNDEVER OPERATING CORPORATION, a Utah Corporation,<br><br>        Defendants. | Case No. 1:12-cv-00081-TC<br><br>**COMPLAINT & JURY DEMAND**<br><br>Honorable Judge: Tena Campbell<br>Magistrate: |

COMES NOW Plaintiff, JOSEPH W. ELLIOTT, an individual by and through his attorneys of BEARNSON & CALDWELL, LLC, hereby complains against Defendants SYKES ENTRPRISES, INC., SITEL WORLDWIDE CORPORATION, FLORIDA MERGERSUB, INC., FOUNDEVER WORLDWIDE CORPORATION, and FOUNDEVER OPERATING CORPORATION as follows.

**COMPLAINT & JURY DEMAND**
*Elliott v. Sykes Enterprises, Inc., et al*
Case No.                                                                                                                     Page **1** of **16**

## PARTIES

1. JOSEPH W. ELLIOTT (hereinafter "Mr. Elliott" or "Plaintiff") is an individual, residing in Cache County, and a citizen of the State of Utah.

2. SYKES ENTERPRISES, INC. ("Sykes") is a Florida Corporation and/or Delaware Corporation that operated until March of 2023.

3. SITEL WORLDWIDE CORPORATION ("the Sitel Group") is a Delaware Corporation who, as set forth below subsequently, merged with Sykes and changed its name to Foundever Worldwide Corporation.

4. FLORIDA MERGERSUB, INC. ("Florida Mergersub") is a Florida Corporation. In or about August of 2021, the Sitel Group acting through its wholly owned subsidiary Florida Mergersub acquired Sykes.

5. FOUNDEVER WORLDWIDE CORPORATION is a Delaware corporation ("Foundever") conducting business in the state of Utah. In or about March of 2023, the Sitel Group and Sykes merged with the surviving company being the Sitel Group. They rebranded themselves as "Foundever" and on March 7, 2023, the Sitel Group changed its name to Foundever Worldwide Corporation.

6. FOUNDEVER OPERATING CORPORATION is a Utah Corporation through whom Foundever conducts business in Utah. For purposes of this complaint, Foundever Operating Corporation and Foundever Worldwide Corporation are referred to collective as "Foundever."

7. Sykes, the Sitel Group, Florida Mergersub, and Foundever are referred to herein individually if applicable, and collectively if applicable, as "Sykes" and/or "Defendants."

8. For all times relevant to this lawsuit, Defendants are by virtue of agreement amongst themselves and/or governing law jointly and severally liable to Plaintiff for the acts and omissions complained of herein, as may be amended.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. On or about March 14, 2022, Mr. Elliott filed his Charge of Discrimination with the Utah Anti-Discrimination & Labor Division and the Equal Employment Opportunity Commission ("EEOC").

10. On April 20, 2023, the EEOC issued to Mr. Elliott a *Notice of Right to Sue*, attached hereto as Exhibit "A." Having exhausted his administrative remedies, Mr. Elliott brings this action within ninety (90) days.[1]

## JURISDICTION & VENUE

11. The Court has subject matter jurisdiction under the Americans with Disabilities Act (ADA), the Family Medical Leave Act (FMLA), and the Age Discrimination in Employment Act (ADEA). See 28 U.S.C. § 1331.

12. This Court is also the proper venue. See 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

13. Sykes hired Mr. Elliott in October of 2014.

14. Approximately one month after the Sitel Group, using its wholly owned subsidiary Florida Mergersub, acquired Defendant Sykes, Defendants on September 16, 2021 terminated Mr. Elliott's employment.

---

1 See 42 U.S.C. § 2000e-5(f)(1).

15. Defendants' stated reason for terminating Mr. Elliott was that his position was "no longer necessary." Defendants' stated reason, however, was not their actual reason or driving motivation in terminating Mr. Elliott's employment.

16. At the time Defendants terminated Mr. Elliott's employment, Mr. Elliott was sixty (60) years old, and he had worked for Defendants for some seven (7) years.

17. Mr. Elliott was older than the median age of Defendants' average employee working in a similar position.

18. Mr. Elliott was also disabled, suffering from clinical depression and post-traumatic stress disorder.

19. In or about the first-quarter of 2021, Mr. Elliott's concentration levels and enthusiasm for work began to wane. Mr. Elliott was experiencing significant stress with non-work-related health issues. On or about March 3, 2021, Mr. Elliott learned that he had cancer.

20. On March 4, 2021, Mr. Elliott's supervisor Ms. Heather McKay placed Mr. Elliott on a Performance Improvement Plan, or a type of discipline known more commonly at work as a "PIP." According to the PIP, Mr. Elliott had to successfully complete the items stated on the PIP within thirty (30) days. If he failed to do so, he would be fired.

21. Mr. Elliott had for the years employed at Defendants enjoyed a stellar performance record. He had never been disciplined, never received a PIP, and had just received glowing praise for a large project finished for a very important client.

22. Surprised by the PIP, Mr. Elliott asked Ms. McKay why he was being placed on a PIP. Ms. McKay was apprised of Mr. Elliott's disability. Notwithstanding, she told Mr. Elliott that the reason he was on a PIP was that his concentration appeared less than normal, he was not as

"sharp" as he had once been; he was less enthusiastic, and according to Ms. McKay, she wanted "the old Joe back."

24. Mr. Elliott was completely shocked by the plan, but nonetheless having just received a cancer diagnosis, did not want to disrupt his employment which he was relying on for health insurance.

24. Mr. Elliott easily met the performance goals and objectives. However, Ms. McKay extended and renewed the PIP again and again, without any real explanation. Again however, because Mr. Elliott was relying on his employment for health insurance, he complied.

25. Notwithstanding, Ms. McKay's actions in holding Mr. Elliott's disability over his head as a basis to fire him was taking its toll. Mr. Elliott's disability-related symptoms surged, and by August of 2021, still subject to Ms. McKay's PIP, Mr. Elliott sought professional help. His provider suggested that if Mr. Elliott was unable to leave his current employment, he try to see if he could take one or more absences from work to escape the environment that was exacerbating his symptoms.

26. On or about August 26, 2021, Mr. Elliott met with two individuals from Defendants' Human Resource Department, showing them his doctor's recommendations in relationship to Mr. Elliott's mental health disorders. The representatives outlined Mr. Elliott's options, which did not include any accommodations or modifications at work or those he worked with. Instead, Mr. Elliott was advised that he would qualify for intermittent FMLA leave.

27. Mr. Elliott applied for FMLA leave, and was approved for the period of September 2021 through December 2021.

28. Ms. McKay was aware of Mr. Elliott's longstanding mental health issues, and that he had requested FMLA leave in order to try and receive some respite from his symptoms. Notwithstanding, Ms. McKay continued to hold the PIP over Mr. Elliott's head, so to speak, which by that time as far as Mr. Elliott knew would be unending.

29. Before Mr. Elliott could exercise any of his FMLA leave, on September 16, 2021 Ms. McKay terminated Mr. Elliott's employment, stating that his job position was no longer necessary.

30. However, Defendants maintained the employment of a different employee who Mr. Elliott had himself trained and promoted. That employee, however, was younger, cost less, and lived outside of the United States of America and thus had no FMLA rights.

31. The truth is that Ms. McKay could not give Mr. Elliott an adequate response as to why he was being terminated from his employment because there was not legitimate response to give. Mr. Elliott was 60 years old, and Ms. McKay had maintained a frivolous and baseless PIP over Mr. Elliott because she knew that when the Sitel Group acquired Sykes, a PIP would make it much easier to include Mr. Elliott on the roster of persons to be "let go" in the wake of the acquisition and restructuring.

32. Despite Mr. Elliott's performance, however, he was also much older than the average employee who worked for Defendants, and Mr. Elliott's age failed to comport with the Defendants' culture.

33. Furthermore, Mr. Elliott was older, and as a result, he cost more. Defendants determined they could have the work they needed done performed by a younger, less costly, international employee, and thereby not have to 'deal with' a disabled employee on intermittent

FMLA leave. As a result, Defendants agreed with Ms. McKay and terminated Mr. Elliott's employment.

34. After Defendants terminated Mr. Elliott, he has been unable to obtain a similar job with similar benefits.

## COUNT 1

### VIOLATION OF AMERICANS WITH DISABILITIES ACT - TITLE I
### Adverse Employment Action, Hostile Work Environment and
### Failure to Accommodate

35. Mr. Elliott incorporates each of the foregoing paragraphs as if set forth fully herein.

36. The Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA") prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112.

37. For all times relevant to this lawsuit, Mr. Elliott suffered from a disability that substantially limited one or more of his major life activities. Specifically, Mr. Elliott suffered from post-traumatic stress disorder and clinical depression.

38. For all times relevant to this lawsuit, Mr. Elliott is a qualified individual under the ADA, able to perform the essential functions of his job with or without an accommodation.

39. For all times relevant to this lawsuit, Defendants were subject to and required to comply with the ADA and its governing regulations.

40. For all times relevant, Defendants were aware of Mr. Elliott's disability and that the symptoms associated with his disabilities impacted his concentration and enthusiasm levels at work.

41. Because of his disabilities, Defendants placed Mr. Elliott on a PIP. According to Ms. McKay, she saw that Mr. Elliott's disabilities were making him "not as sharp" at times, and she wanted "the old Joe back."

**Discrimination by Adverse Employment Action.**

42. Even though the PIP was stated to last only thirty (30) days, Ms. McKay repeatedly extended and renewed the PIP, despite Mr. Elliott having successfully completed the PIP.

43. The PIP lasted up and until Mr. Elliott was unexpectedly terminated from his position under the guise of his position being "no longer necessary." This stated reason was mere pretext. Mr. Elliott's position was not then unnecessary, other similarly situated employees were not let go, and in reality, Defendants decision to terminate Mr. Elliott was driven in whole, or in substantial part by Mr. Elliott's disability as evidenced by the following facts and others found in the course of discovery:

44. Defendants' imposition of a PIP and termination of Mr. Elliott's employment were carried out by the same individual, Ms. McKay.

45. Defendants terminated Mr. Elliott's employment approximately one month after Mr. Elliott requested FMLA leave to address symptoms associated with his disability.

46. Ms. McKay's extensions and renewals of the PIP were inexplicable, and unjustified. Similarly situated employees did not experience the same treatment.

47. Ms. McKay inexplicably and without justification maintained the PIP because she was operating with the understanding that Sykes was to be acquired by another company, and that Mr. Elliott would be more easily "let go" in the wake of the acquisition and any restructuring if he had a PIP.

48. Approximately one month after the acquisition, Defendants, acting through Ms. McKay, terminated Mr. Elliott's employment.

**Discrimination by Hostile Work Environment.**

49. One (1) day prior to Ms. McKay imposing a PIP upon Mr. Elliott, Mr. Elliott received a diagnosis of cancer which Mr. Elliott understood would require several expensive treatments.

50. Ms. McKay was aware of Mr. Elliott's cancer diagnosis.

51. Ms. McKay was also aware of Mr. Elliott's mental health disorders.

52. Ms. McKay was aware that due to Mr. Elliott's mental health disorders and new cancer diagnosis, Mr. Elliott would incur even more distress if he believed his employment was in jeopardy.

53. In an attempt to 'squeeze' Mr. Elliott to seek different employment, Ms. McKay repeatedly imposed the unjustified PIP.

54. As a result of the repeatedly imposed unjustified PIP, Mr. Elliott's disability-related symptoms were significantly exacerbated.

55. But rather than having the effect of squeezing Mr. Elliott to different employment, Mr. Elliott sought professional help who advised Mr. Elliott to try and remove himself from the work environment.

56. On approximately September 2, 2021, Mr. Elliott went to Defendants' Human Resource Department, who advised Mr. Elliott that his disabilities could qualify him for FMLA leave. Mr. Elliott applied for FMLA leave, and was granted the request.

57. Even though Mr. Elliott's intermittent FLMA leave was scheduled to continue until December of 2021, two (2) weeks later on September 16, 2021, Defendants acting through Ms. McKay terminated his employment.

**Discrimination by Failure to Accommodate.**

58. The PIP had been instituted by Ms. McKay, who knew that Mr. Elliott suffered from mental health disorders affecting his levels of concentration and enthusiasm. When asked why the PIP was initiated, Ms. McKay told Mr. Elliott that he was not acting "as sharp" as usual and she wanted "the old Joe back."

59. Being apprised of Mr. Elliott's disabilities, and that his disabilities were negatively impacting his ability to perform one or more tasks associated with his employment, Ms. McKay had the obligation to provide Mr. Elliott with reasonable accommodations.

60. Instead, Ms. McKay issued against Mr. Elliott a PIP.

61. Furthermore, when Mr. Elliott went to Defendants' Human Resource Department, he informed Defendants of his disabilities and need for relief at work from disability-related symptoms. The Human Resource Department did not discuss with Mr. Elliott any possible accommodations.

62. Instead, the Human Resource Department encouraged Mr. Elliott to request intermittent FMLA leave, whereby Mr. Elliott would as a result of his disability actually be excluded from both pay and participation in the work place.

63.  As a reasonable accommodation, Defendants could have removed the harassing PIP; reassigned Ms. McKay to a different team or department; provided Mr. Elliott with additional time to complete one or more tasks; additional breaks; and provided to Mr. Elliott additional support in the review and finalization of projects.

64.  Notwithstanding, what accommodations that could have been implemented were never discussed because Defendants never engaged in the legally-required "interactive process" of the ADA, whereby appropriate accommodations are discovered and implemented. Instead, Defendants simply encouraged Mr. Elliott to apply for FMLA leave. FMLA leave is not an accommodation under the ADA.

65.  As a result of Defendants' intentional discrimination in the form of adverse employment action, hostile work environment, and failure to accommodate and engage in the interactive process, Mr. Elliott has been damaged.

66.  Mr. Elliott seeks both special and general damages, the amounts and quality of which are to be determined at trial. Mr. Elliott also seeks costs and his attorney's fees insofar as such are available via equity, rule and or statute.

## COUNT 2
### VIOLATION OF FAMILY MEDICAL LEAVE ACT
### Interference with Exercise of Family Medical Leave

67.  Mr. Elliott incorporates each of the foregoing paragraphs as if set forth fully herein.

68.  Under the Family Medical Leave Act ("FMLA"), qualified employees are entitled to take up to twelve (12) weeks of leave during a twelve-month period for several reasons, including "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

69. Under the FMLA, it is unlawful to "interfere with, restrain, or deny the exercise" of FMLA rights, see 29 U.S.C. § 2615(a)(1), which unlawfulness occurs when an employee is entitled to FMLA leave, the employer takes some adverse action that interferes with the employee's right to take FMLA leave, and the employer's action was related to the employee's exercise or attempted exercise of FMLA rights.

70. Mr. Elliott had been employed by Defendants for over twelve (12) months, had not exhausted his FMLA rights, and therefore was entitled to receive FMLA leave.

71. Pursuant to the FMLA leave Mr. Elliott was entitled to, he should have enjoyed intermittent FMLA leave up until December of 2021.

72. On September 16, 2021, just three weeks after Mr. Elliott had requested FMLA leave, Defendants interfered with Mr. Elliott's ability to receive FMLA leave by terminating Mr. Elliott's employment.

73. As a result, Mr. Elliott could not exercise his FMLA leave.

74. Defendants terminated Mr. Elliott, in whole or in substantial part, because of Mr. Elliott's need for intermittent FMLA leave. Specifically, Defendants terminated Mr. Elliott under the guise of his position being "no longer necessary." However, Defendants maintained the employment of another employee whom Mr. Elliott had trained and promoted, and who by and large performed Mr. Elliott's same job after Defendants terminated Mr. Elliott's employment.

75. The difference, however, was that the employee Defendants kept was in El Salvador. Thus, Defendants determined that they could get more work done by an employee who was not on FMLA leave (and had no FMLA rights), and as a result, get it done cheaper.

76. As a result of Defendants interfering with Mr. Elliott's FMLA rights, Mr. Elliott has been damaged.

77. Mr. Elliott seeks back pay, front pay, liquidated damages, costs and his attorney's fees insofar as such are available via equity, rule and or statute.

## COUNT 3
## VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT
### Age Discrimination

78. Mr. Elliott incorporates each of the foregoing paragraphs as if set forth fully herein.

79. On September 16, 2021, Mr. Elliott was sixty (60) years old. Wherefore, for all times relevant to this case Mr. Elliott is a member of a protected class.

80. At the time Mr. Elliott was terminated, Mr. Elliott was performing satisfactory work. In fact, in one of the most important projects of the year which had just been completed, Mr. Elliott received high praises for his performance. Furthermore, Mr. Elliott had never previously been the subject of oral or written discipline, and had consistently received positive reviews of his work performance.

81. On September 16, 2021, Defendants terminated Mr. Elliott's employment, stating that Mr. Elliott's position was no longer necessary. This was untrue.

82. Defendants retained an employee whom Mr. Elliott had trained and promoted, and who performed essentially the same tasks as Mr. Elliott.

83. The employee who Defendants retained was younger than Mr. Elliott.

84. Furthermore, the median age of Defendants' employees holding a position akin or alike to the position Mr. Elliott held is ten (10) or more years younger than Mr. Elliott's age, as

such was at the time Defendants terminated Mr. Elliott's employment on September 16, 2021. See *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038 (10th Cir. 2020).

85. In addition to or in alternative to the foregoing facts, Sitel had just acquired Sykes, and was performing an overarching restructuring of the organization to bring Sykes into conformity with Sitel's corporate culture which included, among other things, age.

86. As a result of Defendants discriminating against Mr. Elliott for his age, Mr. Elliott has been damaged.

87. Mr. Elliott seeks back pay, front pay, liquidated damages, costs and his attorney's fees insofar as such are available via equity, rule and or statute.

## ADDITIONAL FACTS
### Damages

88. Mr. Elliott by reference incorporates each of the foregoing paragraphs as if fully restated, herein.

89. Title I of the ADA permits punitive damages to be awarded.

90. Because Mr. Elliott is disabled, Defendants subjected Mr. Elliott to a frivolous unending PIP for the purpose of facilitating termination at a later date under a forthcoming acquisition and restructuring plan. Wherefore, Defendants deliberately, willfully, wantonly, maliciously, or with knowing reckless disregard or indifference violated Mr. Elliott's rights as a disabled individual. Employers should be strongly discouraged from scheming to deliberately circumvent a disabled employee's rights, and as such, public interest demands Defendants be punished and deterred from similar conduct in the future.

91.     The ADEA requires liquidated damages be awarded when the employer's violation of the ADEA is willful. See 29 U.S.C. § 626(b)

92.     Because Mr. Elliott did not conform to the typical age of Defendants and Defendants did not wish to expend more money when they could expend less money on a younger individual, Defendants terminated Mr. Elliott's position. Wherefore, Defendants willfully violated Mr. Elliott's rights as a protected person under the ADEA.

93.     The FMLA requires liquidated damages be awarded when the employer's violation of the FMLA is willful. See 29 U.S.C. § 2617(a)(1)(A)(iii)

94.     Defendants did not have a good faith basis for terminating Mr. Elliott's position when such was for the purpose of evading and interfering with Mr. Elliott's FMLA rights, removing a disabled protected person from its ranks, and removing the 'old wood' from a newly purchased company. Nor did Defendants have reasonable grounds to believe that terminating Mr. Elliott would not violate his FMLA rights, where the request to exercise FMLA leave had been requested, granted, not yet exercised, and forever precluded by the Defendants' termination of Mr. Elliott's employment.

95.     Wherefore, Mr. Elliott is entitled to Punitive Damages under Title I of the ADA; liquidated damages under the ADEA; and liquidated damages under the FMLA in an amount to be determined at trial.

## **DEMAND FOR JURY TRIAL**

96.     Mr. Elliott demands a jury trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Elliott hereby requests an order and enter judgment against Defendants as follows:

1. Damages, general and special damages;

2. Back pay and front ("future") pay;

3. Punitive damages under Title I of the ADA;

4. Liquidated damages under the ADEA and FMLA;

5. Pre-judgment interest and post-judgment interest;

6. Attorney's fees and all allowable costs; and

7. Any other relief the Court deems just and appropriate.

DATED this  7th  day of July, 2023.

                                               BEARNSON & CALDWELL, LLC

                                               */s/ Aaron K. Bergman*
                                               Brad H. Bearnson
                                               Wayne K. Caldwell
                                               Aaron K. Bergman
                                               *Attorneys for Plaintiff*

**COMPLAINT & JURY DEMAND**
*Elliott v. Sykes Enterprises, Inc., et al*
Case No.                                                                                              Page **16** of **16**